# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

**NO. 03-22-00342-CV**
**NO. 03-22-00347-CV**

---

**Y. A., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY**
**NOS. D-1-FM-21-000228 & D-1-FM-20-002618,**
**THE HONORABLE CATHERINE MAUZY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the district court terminated the parental rights of Y.A. (Father) to his children M.A. (Daughter), born May 17, 2014, and J.A. (Son), born January 11, 2021.[1]  In a single issue on appeal, Father asserts that the evidence is factually insufficient to support the district court's finding that termination of Father's parental rights is in the best interest of the children.  We will affirm the district court's termination decrees.

---

[1]  The district court terminated Father's parental rights in two separate termination decrees, and Father filed a notice of appeal from each decree.  Father's parental rights to Daughter are the subject of the appeal in No. 03-22-00347-CV.  Father's parental rights to Son, who was born while the case involving Daughter was ongoing, are the subject of the appeal in No. 03-22-00342-CV.  The cases were consolidated for trial and have been consolidated for briefing purposes on appeal.

## BACKGROUND

The case began in May 2020, when the Texas Department of Family and Protective Services (the Department) received a referral alleging that Father had physically abused J.B., his twelve-year-old stepson (Stepson), and that Stepson's mother, C.H. (Mother) had allowed Father to abuse him. In the Department's removal affidavit, Child Protective Services (CPS) investigator Diane MacLeod averred that

> [Stepson] went to a neighbor's home and asked for help due to ongoing physical abuse. His lips were swollen and bloody, and his face was bruised. [Stepson] was crying, holding onto his ribs, and had trouble speaking. He told the neighbor that his stepfather, [Father], hit him with his fist and an electric cord on his legs, arms, face, and buttocks. When Emergency Medical Services (EMS) arrived, they noted what appeared to be old bruising on [Stepson]'s buttocks and additional bruising in several places on his body. [Father] and [Mother] were unable to be located. [Stepson] was transported via EMS to Dell Children's Medical Center (DCMC), where he was found to have bruising and scarring on his face, neck, back, shoulder, arms, legs, and buttocks.

> The Department was able to verify these concerns upon interviewing [Stepson] and observing him at [DCMC]. As a result of these discoveries, the Department has significant concerns regarding Father's response to [Stepson]'s behaviors and additional concern related to the protective capacity of [Mother].

Following additional investigation, MacLeod concluded that Stepson had extensive injuries "that appear to have been inflicted on numerous occasions consistent with ongoing intentional child abuse" and that "[t]he ongoing extensive nature of [Stepson's] injuries combined with [Daughter]'s young age and inability to protect herself raises serious concerns that [Daughter] is at high risk of child abuse in the care of her parents." Based on these allegations, Stepson and Daughter were removed from Mother and Father and the Department filed a petition seeking termination of their parental rights and managing conservatorship of the children. While the case

was ongoing, Mother gave birth to Son, who also was removed from Mother and Father. The Department filed a separate petition seeking termination of Mother's and Father's parental rights to Son.

The case proceeded to a five-day bench trial at which numerous witnesses testified, including Mother; Father; Department caseworkers Molly Mead and Anna Reed; Rosy Guerra, a forensic interviewer who had interviewed Stepson and Daughter; Diane MacLeod, the CPS investigator who had investigated the case; the foster mother for Daughter and Son; and Lena Laxton, the Court Appointed Special Advocate (CASA) for the children.

At the conclusion of trial, the district court found by clear and convincing evidence that Mother and Father had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger their physical or emotional well-being, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E),[2] and that termination of Mother's and Father's parental rights was in the children's best interest, *see id*. § 161.001(b)(2). The district court later signed termination decrees terminating Mother's and Father's parental rights to Daughter and Son. These appeals by Father followed.[3]

---

[2] On appeal, Father has not challenged the district court's findings regarding the statutory grounds for termination.

[3] Mother has not appealed the termination decrees.

3

## STANDARD OF REVIEW

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam.

Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id*. "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id*.

**DISCUSSION**

In his sole issue on appeal, Father asserts that the evidence is factually insufficient to support the district court's finding that termination of his parental rights is in the best interest of the children. Specifically, Father argues the following:

> The manner with which [Father] used force to discipline [Stepson] was wrong, but [Father] acknowledged his mistake and committed to growing as a parent and as a person. During the case, he made an immense amount of progress and was ultimately a posterchild for why the courts order parents to engage in services.

> DFPS did not establish by clear and convincing evidence that [Daughter] or [Son] desired that [Father's] parental rights be terminated. And although [Father] made a very regrettable mistake with [Stepson], the skills he nurtured and demonstrated during the case, coupled with his otherwise positive track record as a parent, demonstrated his parenting skills and his ability to meet [Daughter] and [Son]'s future emotional and physical needs. Further, during the case, [Father] was able to maintain his own job and housing stability, while simultaneously providing for [Mother]'s needs.

> In light of all the circumstances, the evidence at trial was not factually sufficient to demonstrate that terminating [Father]'s parental rights to [Daughter] and [Son] was in the children's best interest.[4]

***Governing law***

When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the

---

[4] This represents the entirety of Father's argument on appeal. The background section of his brief is similarly lacking in factual detail. Considering the voluminous amount of evidence presented at trial, which we summarize below, we find this issue to be inadequately briefed. *See* Tex. R. App. P. 38.1(i). Nevertheless, we will address the issue in the interest of justice.

6

child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

### Evidence presented at trial

Diane MacLeod, the CPS investigator who had received the intake report alleging that Stepson had been abused, testified that when she arrived at Dell Children's Medical Center, where Stepson was being evaluated, she observed that Stepson "had multiple bruises on various parts of his body that were visible." MacLeod added that she observed bruises on "[m]ultiple areas" of Stepson's body: "His face, his neck, both arms, the tops of his feet, the inside of one ankle, his back, his bottom, legs." Some of the wounds looked more recent than others, "and there was some scarring too."

MacLeod interviewed Stepson at the hospital. According to MacLeod, Stepson "was trying his best to be brave and a few times he did start crying but he was very articulate about what had been going on." Specifically,

> [Stepson] told me that he had been going to school virtually so he was home that morning. [Daughter] was home, and I believe his mom went to work. [Father] was home, and [Stepson] was doing his homework on his computer. He finished and then he was playing video games and [Father] came in and realized he was playing video games and that's when he got angry and started to hit [Stepson]. He left the room for a while, I believe, came back, hit him again, then left for work. And after he left for work, [Stepson] was trying to contact law enforcement. He doesn't have a phone. He was trying to figure out how to call 911 on his computer, but he couldn't so he went to the neighbor next door, who he knew, and asked her for help.

Stepson also told MacLeod that the abuse "had been going on for approximately one and a half to two years," "about one to two times per week," and included both physical and verbal abuse, with Father calling him "demeaning names" such as "bitch," "retard," and "fuckboy."

MacLeod later interviewed Mother and Father. Mother acknowledged that she had seen Father hitting Stepson, that she had seen marks and bruises on Stepson, and that "a few times she had told [Father] to stop because . . . she was concerned that it had gone too far." Father admitted to McLeod that he "does use a belt" to discipline Stepson but otherwise denied Stepson's abuse allegations.

Rosy Guerra, a forensic interviewer at the children's advocacy center in Austin, interviewed Stepson shortly after his removal from Mother and Father. Guerra testified that Stepson had told her that Father had been hitting him for "over a year and a half," using his hand, his foot, a scratching stick, an electric cord, and a belt. Stepson also told Guerra that the last incident occurred on the day he reported the abuse. Father had discovered Stepson playing

8

games on his school computer, which he was not allowed to do, and Father proceeded to "hit [Stepson] in the head and also grabbed his head and banged it against the wall. At one point [Father] also kicked him numerous times while he was on the ground, kicked him in the stomach." Stepson "was on his knees with his hands up" while Father "kicked him" repeatedly, telling him, "Fuck you, you're an asshole, I want to kill you." Guerra added, "After the event ended [Father] left the room, smiled at him and told [Stepson] he wished he were dead." Guerra further testified that Stepson told her that Father had called him names such as "[f]ucker, asshole, bitch, retard." Stepson also told Guerra that he had heard Father hitting Daughter and had seen bruises on her back from the hits.

Guerra interviewed Daughter on three occasions, and during those interviews, Daughter made statements indicating that she was aware that Father had hit Stepson. Additionally, Daughter made an outcry of possible sexual abuse by Father, telling Guerra and MacLeod in separate interviews that Father had taken a shower with her when she was five while they were both naked and that he had touched the inside of her vagina, which she referred to as her "pee-pee." Daughter also told Guerra that "she did not feel safe with [Father] because he hurts people."

Mother corroborated some of Son's allegations against Father, testifying that she had seen Father hit Stepson with a belt on at least two occasions when Stepson was eleven or twelve years old to "discipline" Stepson for problems at school and that she had seen marks and bruises on Stepson following those incidents. Mother also testified that Stepson was "terrified" of Father and that Father had been verbally abusive to Stepson, calling him names such as "Fucker Boy," "Worthless," and "Asshole."

9

Department caseworker Molly Mead was assigned to the case in May 2020. Mead testified that she prepared a service plan for Father and that he complied with many of the plan's requirements, including completing a batterer's intervention program; attending, participating, and successfully completing a nurturing parenting program; undergoing a psychological evaluation; and engaging in individual therapy. However, at the time Mead left the Department in May 2021, the Department "was still concerned at the lack of transparency regarding what had happened to [Stepson], specifically physical abuse and [Father]'s ability to take responsibility and present reasonable efforts to prevent something similar happening in the future." Additionally, Mead testified to another outcry of possible sexual abuse that Daughter made during the case, that Mother and Father were having sex with each other while Daughter was in the bed with them, and "their buttocks [were] touching her butt while it's occurring."

Mead further testified that when the case began, Stepson and Daughter were placed together in a foster home in Pflugerville. However, in July 2020, they were separated after the foster parents raised concerns of sexually inappropriate behavior between Stepson and Daughter. Stepson was moved to a residential treatment center while Daughter remained in the foster home until December 2020, when communication difficulties and other issues between the Department and the foster parents "made that placement unsustainable."

Daughter and Son's current placement was with S.M. (Foster Mother), an education director at a church. Foster Mother testified that Daughter was placed with her in December 2020 and Son was placed with her on January 14, 2021, three days after he was born. The home consisted of Foster Mother, Daughter, Son, and their two cats. Foster Mother explained that when Daughter was placed in her care,

10

> [Daughter] was happy, she was excited to move in and we were going to have some cats. She was very responsive to me, she was obedient, I would say. She was uncomfortable with physical touch and she would—I guess, ambivalence would be the word. She would maybe ask for a hug but then not know how to give it or not look comfortable when she gave it. I would say overall she gave off an overwhelmingly positive demeanor. She had no behavior issues when she came and was just a joy to have here.

Regarding Son's placement, Foster Mother testified,

> He was three days old so he slept a lot. And aside from the dairy intolerance that we found out about pretty early on, he was very happy, very content. He was very, I would say, affectionate and responsive from the beginning. Within two days of living here, he would sometimes smile in response to my voice or [Daughter]'s voice. So he definitely attached quickly.

Foster Mother further testified that the children have "natural routines" such as school for Daughter and "a good share of appointments," including regular therapy sessions and "visits with biological dad on Fridays and visits with their mother on Saturdays." She added,

> The kids come to the church programming on Wednesday nights and on Sundays at the church where I am employed and we are active. [Son] comes to work with me a few days a week and he's a big hit there. He comes on Wednesday and Thursdays. [Son] goes to a babysitter on Tuesday for part of the day while I'm at work.

Foster Mother also provided extensive testimony regarding Daughter's and Son's dietary needs and issues and Daughter's interests and behavior patterns. Foster Mother explained that she does not use physical discipline with Daughter but that "redirection works extremely well."

Foster Mother testified that she wanted to adopt both children. When asked about her future plans for taking care of them, she testified,

11

My plan is to continue to have them feel safe. I would like them to feel stable—not only safe but stable. There is a lot in their recent history to process, so I would like to continue to be a safe place for that. . . . [Daughter] has expressed very little in terms of her own feelings, but I would like to be a safe space for that when she does. And I would say that she's growing in that area. [Daughter] was able to participate in a lot of fun camps last summer. She really enjoyed getting to try a lot of new things: Tennis camp, track camp, soccer camp. I know that she would like to repeat some of that and she's also expressed desire to try volleyball camp and to learn how to swim and things like that. So even just physically there are a lot of things that we're looking forward to her being able to try.

[Son], obviously, some of his bigger needs are to feel secure and stable. I would also like to see him continue to grow in independence in being away from me. He struggles sometimes to transition away from me. That's one thing I have not talked about yet with visits, but that has been a hard thing for him. I also want to continue our occupational therapy and therapy with the dietician. He needs to obviously continue his feeding therapy and his tolerance of food, but those are a few things that I have in the short term.

Foster Mother also expressed a willingness to facilitate visits between Daughter and Son and Mother and Father even after their parental rights were terminated, so long as Foster Mother could "make sure that any contact would be both safe and healthy."

Department caseworker Anna Reed took over the case in November 2021 and was the caseworker at the time of trial.[5] Reed testified that when she took over the case, both Mother and Father "had completed the majority of their services" and Father "was attending individual therapy and visitation with [Daughter] and [Son]." Despite Father's compliance with his service plan, Reed continued to have concerns regarding Father's parenting abilities, specifically "his ability to meet just their basic needs, to redirect appropriate behavior to his kids," and his ability to apply the "content being learned in services" to the "moments with his children." Reed explained, "[I]t's my understanding that [Father] has to be redirected or shown how to manage

---

[5] Reed testified that there was another caseworker between the time Mead left the Department and Reed took over the case. This caseworker did not testify at trial.

different developmental stages of his one-year-old child during visitation." She added, "It's also my understanding that on multiple occasions [Father] has had to be redirected on how to set healthy boundaries during visits with [Daughter]." Later in her testimony, Reed elaborated,

> [T]he Department is concerned about [Father's] lack of acknowledgment or accountability to ongoing abuse that [Stepson] and [Daughter] endured; that while he has completed all of his services, he was not honest during individual therapy, which is one of the most important services on his family plan. I'll also add that the Department is concerned not just that there isn't acknowledgment or accountability but we can't move forward with ensuring safety in the future if we can't talk about how to prevent things that have occurred in the past.

Reed testified that the Department's plan for Daughter and Son was for them "to stay in their current placement and be adopted."

Lena Laxton, the CASA volunteer on the case since August 2021, testified that she had visited Daughter and Son in their current placement three times and that she had no concerns with their home. She also testified that CASA had concerns regarding Father's ability to meet the emotional and physical needs of Daughter and Son. Laxton explained, "Well, [Father] describes [Stepson] as his firstborn son and he admitted guilt to physical abuse. And if that's how he treats his firstborn son, it stands to reason that there's potential for him to do the same to his other two children as well." She added that Father "still does not seem to take responsibility or accountability for what he did. And he also, like [Mother], minimizes what he did and even professes it's a one-off, when it's obvious it wasn't." Laxton elaborated that

> CASA has concerns with [Father]'s parental abilities in that he doesn't seem to understand—he really doesn't seem to have an understanding of what—that his actions were incorrect. I think he understands that he should not have done them because of the consequences that have happened, but he didn't seem to understand how they were wrong to begin with . . . .

13

Laxton also had concerns about possible emotional and physical danger to Daughter and Son if they were returned to Father. Regarding Daughter, Laxton testified that there were concerns "about the potential for some inappropriate physical contact, the showering naked with her," particularly because Daughter had discussed that incident on multiple occasions. Regarding Son, Laxton testified,

> [M]y main concern with [Son] is, you know, he's never been with [Father] or [Mother] and he hasn't bonded to them, and if he—so there's concern there. And if he were to be removed from [his] current placement, then there's going to be significant potential distress because of that. His current placement is the only parental bond he has, and if you separate that that can actually cause a lot of harm to that child. And so that's caused a significant concern . . . .

Laxton did not have any concerns with Foster Mother's parenting abilities, her ability to meet Daughter's and Son's emotional and physical needs, or her ability to keep them free from danger. Laxton testified that CASA's recommendation was termination of Father's and Mother's parental rights and adoption by Foster Mother.

Father testified that he did not abuse Stepson and that he considers Stepson to be his own child. Father believed that he had shown Stepson the same love and care that he had shown to his other children. However, Father admitted that he physically abused Stepson "one time" in May 2020 by hitting him with a belt. Father acknowledged that this was "wrong, inappropriate." Based on that incident, Father was charged with and pleaded guilty to the offense of injury to a child and was placed on community supervision. Father also admitted to threatening and "scaring" Stepson with a stick on one occasion by pointing the stick at him, although he denied hitting him with it. Father denied all the other allegations of abuse that were made against him. Father testified that Stepson was lying about the physical abuse. When asked

14

if Daughter was similarly lying about the sexual abuse, Father testified that Daughter "doesn't know nothing" and that he believed she had been "brainwashed," possibly by Foster Mother. Later, when asked if it would be fair to say that he "wouldn't know how to handle a daughter who has been a victim of sexual abuse, how to deal with that trauma," Father testified, "I would say she's not [a] victim. She was five, she doesn't know nothing."

Father also denied that he was ever verbally abusive to Stepson or that he had any anger issues, although he did acknowledge that his "frustration" with Stepson had transformed into anger on the occasion when he hit him with a belt. Father testified that in the future, he would discipline Son differently than he disciplined Stepson, "[b]y communication, teaching, demonstrating what he did wrong."

Father testified that Mother had filed for divorce from him and for a protective order against him, and that he no longer lives with her. When asked where he plans to live for the next year, Father testified that he "[didn't] have any idea" but that he was currently staying with a friend, "sleeping on a couch" and "struggling financially." When asked if he had "a home to live at," Father testified, "Well, this is [a] complicated question. So you are asking me now, depending—I don't know what's going on. I only—I did my service[s] properly. I want my kids. I didn't expect the divorce. . . . I didn't expect . . . the protective order." He added that he had family in Virginia and was talking with them about the possibility of moving there. Father also testified that he was employed as a quality inspector in the pharmaceutical industry, and he testified extensively about his visits with Daughter and Son, about how he planned to discipline them in a way that focused on communication and "timeouts," and about what he had learned during therapy and in his parenting class.

15

Department technician Debra Dilley observed many of the in-person visits between Father, Daughter, and Son. Dilley testified that she "had to step into a couple of visits to redirect [Father] at the beginning of [Son's] visits to explain to him how to feed [Son], how to change [Son], try some different things to calm [Son] down because he would cry the entire visit." Dilley added that Father became "frustrated" in response to Son's crying and that he tried to stop him from crying by "rocking [Son] very aggressively" and that "[i]f that didn't work, then he would sit down, and he would put [Son] on his chest, and he would try patting his bottom very roughly." Dilley also "had to step in and redirect him with behaviors with [Daughter] as far as the playing too rough together or him not stopping her from doing something that was not safe for her." However, Dilley acknowledged that Father would appear to listen to her directions during the visits and that he attended the visits regularly. Dilley also testified that Daughter enjoyed her visits with Father, that Father brings gifts to Daughter "just about" every visit, and that "for the most part she's in a happy mood the entire visit."

Clayton Turner, a licensed professional counselor who provided counseling services to Father, testified that Father did well in therapy, consistently attended sessions, had learned to express his anger in "healthy ways," and had demonstrated regret and remorse for hitting Stepson, although Father told Turner that it only happened "[o]ne time in one event." Turner opined that Father had "continually improved" during his months of therapy and that Father was "determined to show his improvements and to really live them." On cross-examination, Turner testified that he had discussed Daughter's outcry against Father, and although Father did not admit that he sexually abused Daughter, he did "understand how painful and traumatizing" sexual abuse would be to a child. Turner further testified that Father had admitted that he told Stepson on one occasion that he wished he were dead.

16

Ruth Wells, who oversaw Father's participation in the nurturing-parenting class, testified that during Father's fifteen sessions in the class, Father "was very attentive, very responsible," "was always ready for the class at the time," and always participated in the discussions. Based on Father's participation in the class, Wells "believed he could be a good Father." On cross-examination, Wells acknowledged that she had not met Father in person because all the parenting sessions "were over the phone," with the participants placed "on speaker" while she directed the lessons.

*Analysis*

In sum, there was evidence both contrary to and in support of the district court's finding that termination of Father's parental rights was in the best interest of the children. On one hand, Father denied most of the allegations against him, including that he had physically abused Stepson more than once, that he had verbally abused Stepson, and that he had sexually abused Daughter. Father also presented evidence that he had completed his court-ordered services and that through therapy and nurturing-parenting classes, he had learned how to manage his anger and become a better parent. Both Father's therapist and the director of the parenting classes believed that Father's parenting skills had improved and that he could be a good parent. Additionally, Father regularly attended the Department's scheduled visits with his children and brought Daughter gifts, and although Father needed some "redirection" from the Department during those visits, Daughter enjoyed the visits.

On the other hand, the district court as factfinder was entitled to disbelieve Father's denials of abuse, *see In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (explaining that in termination cases, factfinder is "the sole arbiter when assessing the credibility and demeanor of

17

witnesses"), particularly in light of the other evidence in the case. Father admitted to physical abuse of Stepson on one occasion, and this incident resulted in criminal charges being filed against Father for injury to a child, an offense to which he pleaded guilty. Father also admitted to threatening to hit Stepson with a stick on another occasion, although he denied hitting him with it. CPS investigator MacLeod testified that when she saw Stepson at the hospital following his report of the abuse, she observed bruises on "[m]ultiple areas" of Stepson's body, including his "face, his neck, both arms, the tops of his feet, the inside of one ankle, his back, his bottom, legs," that some of the bruises looked more recent than others, and that there was scarring on some parts of Stepson's body. Stepson told MacLeod that the abuse "had been going on for approximately one and a half to two years," "about one to two times per week." The district court could have reasonably inferred from this and other evidence that Father had physically abused Stepson on more than one occasion and that the abuse was severe. Moreover, Mother corroborated some of Stepson's allegations against Father, testifying that she had seen Father hit Stepson with a belt on at least two occasions and that she had seen marks and bruises on Stepson following those incidents. Mother also testified that Stepson was "terrified" of Father and that Father had been verbally abusive to Stepson, calling him names such as "Fucker Boy," "Worthless," and "Asshole." This was consistent with statements that Stepson had made to MacLeod and Guerra describing Father's verbal abuse. Additionally, Daughter made statements to Guerra indicating that she was aware that Father had abused Stepson, and she also told Guerra that "she did not feel safe with [Father] because he hurts people." In light of this and other evidence, the district court could have reasonably inferred that Father had abused Stepson repeatedly and concluded that Daughter and Son were at risk of similar abuse if Father's rights to them were not terminated. *See In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, at *6

18

(Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.) (concluding that returning child to parent's care could result in emotional and physical danger to child because of parent's past abusive conduct with child's siblings).

Also, Daughter had reported possible sexual abuse by Father to both the CPS investigator and the forensic interviewer. The district court was free to disbelieve Father's denial and to infer that Father had an improper relationship with and was a danger to Daughter for that reason. *See In re T.H.*, No. 05-99-01142-CV, 2000 WL 1853042, at *5 (Tex. App.—Dallas Dec. 19, 2000, no pet.) (mem. op.) ("Evidence of sexual abuse is a significant factor in determining whether termination of the parent-child relationship is in the best interests of the child.").

In addition to the evidence that Father was physically, sexually, and verbally abusive, there was also evidence that Father's current living situation was unstable and that he "[didn't] have any idea" where he was going to live in the next year. Father testified that he was currently staying with a friend, "sleeping on a couch" and "struggling financially." Although Father testified that he had family in Virginia, he had only talked with them about the possibility of moving there.

Further, the Department and CASA remained concerned that Father was not being honest and transparent regarding the full extent of his past abuse. Caseworker Mead testified that when she left the Department in May 2021, the Department "was still concerned at the lack of transparency regarding what had happened to [Stepson], specifically physical abuse and [Father]'s ability to take responsibility and present reasonable efforts to prevent something similar happening in the future." Caseworker Reed testified that those concerns remained at the time of trial. According to Reed, the Department was "concerned about [Father's] lack of

19

acknowledgment or accountability to ongoing abuse that [Stepson] and [Daughter] endured," that "he was not honest during individual therapy," and that the Department "can't move forward with ensuring safety in the future if we can't talk about how to prevent things that have occurred in the past." CASA volunteer Laxton similarly testified that Father "still does not seem to take responsibility or accountability for what he did," "minimizes what he did and even professes it's a one-off, when it's obvious it wasn't," and "really doesn't seem to have an understanding . . . that his actions were incorrect." She added, "I think he understands that he should not have done them because of the consequences that have happened, but he didn't seem to understand how they were wrong to begin with."

Finally, Daughter and Son had been placed together in a loving home, with a foster mother who wanted to adopt them, took care of them, and provided them with "normal routines" and stability. Laxton had visited Daughter and Son in their current placement three times and had no concerns with their home or with Foster Mother's parenting abilities, her ability to meet Daughter's and Son's emotional and physical needs, and her ability to keep them safe. Laxton also testified that Son had never lived with Father and had not bonded to him. Thus, "if he were to be removed from [his] current placement, then there's going to be significant potential distress because of that. His current placement is the only parental bond he has, and if you separate that that can actually cause a lot of harm to that child."

On this record, when weighing the disputed evidence contrary to the finding against all the evidence favoring the finding, we conclude that the disputed evidence is not "so significant" that the district court would have been unable to form a firm belief or conviction that termination of Father's parental rights was in the best interest of Daughter and Son. Accordingly, the evidence is factually sufficient to support the finding.

20

We overrule Father's sole issue on appeal.

## CONCLUSION

We affirm the district court's termination decrees.

_____
Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Smith
  Concurring Opinion by Chief Justice Byrne

Affirmed

Filed:  November 29, 2022